**FOREMAN v. NEEDLES et al.**

No. 8987—Opinion Filed March 2, 1920.

Rehearing Denied April 13, 1920.

(Syllabus by the Court.)

**Usury—Joint Adventures—Speculative Profits.**

H. N. and three others purchased certain land for the purpose of having the same platted into lots as an addition to the city of Muskogee. Each party was to share in one-fourth of the net profits of the venture arising from the sale of the lots after the payment of the balance of the purchase money, the expenses, and the several amounts contributed by the parties respectively. The mortgage given by the parties to secure the balance of the purchase money being about to mature, a loan of $25,000 was secured from the plaintiff upon the following conditions: The interest of E., one of the original parties, was to be purchased and paid for out of the $25,000 and assigned to plaintiff. H. N. and the two remaining owners were to execute a note for $25,000, with interest from the date thereof at ten per cent per annum, the same to be secured by a mortgage covering the entire townsite or addition; plaintiff to have one-fourth of the profits arising

from the sale of the lots comprising the addition after the payment of all expenses incurred in improving, selling, and disposing of the said land, and the $25,000 with interest. Held, that the transaction was not usurious on the part of the plaintiff, as the value of the interest of E., assigned to plaintiff was purely speculative, indefinite, uncertain, and very doubtful.

Error from District Court, Muskogee County; R. P. de Graffenried, Judge.

Action by Hamilton A. Foreman against Homer Needles and others. Judgment for defendants, and plaintiff brings error. Reversed and remanded.

J. G. Ralls, M. C. Bainum, and W. J. Horton, for plaintiff in error.

Zevely, Givens & Stoutz, for defendants in error.

PITCHFORD, J. Prior to December 3, 1910, the defendants, Homer Needles, H. M. Needles, E. B. Grubbs, and one A. R. Elliott owned (an undivided one-fourth each) the lands described in the mortgages exhibited with the petition herein, which they had platted as University Heights addition to the city of Muskogee, and which they had acquired for sale as town lots for profit. The title was held in the name of Homer Needles under a trust agreement dated December 23, 1909. The land consisted of three tracts, and had been purchased from one Harris, as guardian of his minor children, for about $21,360, one-half of which had been paid, the balance being evidenced by mortgages aggregating approximately $11,000 to the guardian. The trust agreement between the defendants and Elliott recited that of the original purchase price, H. M. Needles had individually contributed $2,137.50, Homer Needles, H. M. Needles, and Grubbs collectively $3,365.50, and Elliott, $5,000. It appears that neither H. M. Needles nor Grubbs actually paid anything, except that the proceeds of a note to the Muskogee County Bank signed by them and Homer Needles for $3,652.50, was applied for that purpose. Grubbs was admitted into the venture for services in influencing Elliott, who was related to him, to invest his $5,000. The trust agreement, among other things, provided that the moneys arising from the sale of the lots should be paid and distributed first to the satisfaction of the Harris mortgages; second, to the payment of expenses of platting, improving, and disposing of the lands; third, to reimburse Homer Needles, H. M. Needles, and Grubbs $3,652.50, with interest at 8 per cent. from November 16, 1909; fourth, to reimbursing Homer Needles $2,137.50, with interest at 8 per cent from May 1, 1910; fifth, to reimbursing Elliott $5,000, with 8 per cent.

interest from November 16, 1909; the remainder to the parties equally one-fourth each.

Prior to November, 1910, considerable work had been done toward improving the addition; the lands had been platted, a number of contracts for the sale of the lots had been made, and one lot had been sold and conveyed. No additional funds had been contributed by the parties. By this time the parties were in need of further financial aid, and it appears that H. M. Needles, living at that time near St. Louis, and a personal friend of the plaintiff—they having known each other for 25 or 30 years—solicited a loan of $25,000 from the plaintiff. Thereafter Homer Needles went to St. Louis and laid the situation before the plaintiff, Foreman. At that time Homer Needles represented the property to be worth $100,000. The $25,000 was needed to improve the property and pay off the Harris mortgages, and also to pay Elliott his $5,000; and he, himself wanted $1,000 of his cash advanced reimbursed. There was some delay in negotiating the loan of the $25,000. It was finally, however, agreed that if the $25,000 should be advanced by the plaintiff, the Elliott interest would be paid out of the funds so advanced, and that this interest would be assigned to the plaintiff. Homer Needles returned to Muskogee, and the necessary papers were prepared; that is, Homer Needles, H. M. Needles, and Grubbs executed their note to the plaintiff for $25,000, with interest from the date thereof at 10 per cent. per annum; and to secure the note a mortgage was given covering the entire property composing the townsite, less the lots that had been theretofore disposed of. The papers were then forwarded to St. Louis to an attorney by the name of Phillips, he having been agreed upon by all the parties concerned. The Elliott interest was assigned to the plaintiff, the amount paid for this interest being $5,400; $11,000 was paid to satisfy the Harris mortgages; the balance was forwarded to a bank in Muskogee and deposited to the credit of Homer Needles, trustee. It appears that $1,000 of this sum was used by the trustee in the re-payment of that amount theretofore advanced by the trustee. The balance was used in the improvement of the townsite. The first year's interest on the $25,000 was paid with the proceeds of lots sold by Homer Needles, the trustee. When the next year's interest became due, the parties were unable to pay the same and borrowed from the plaintiff an additional $4,000, which was used to pay the second year's interest, together with other expenses that had been incurred. This $4,000 was secured by the interest of E. B. Grubbs and H. M. Needles in the townsite. On June

5, 1914, plaintiff filed his petition praying for judgment against the defendants, Homer Needles, E. B. Grubbs, and H. M. Needles, for the amount due on the two notes, together with interest and attorney's fees, and for foreclosure of the mortgages. The main defense relied upon by the defendants was that the notes sued on were tainted with usury, and for that reason plaintiff should not be entitled to recover. The cause was tried and submitted to the court, a jury being waived, on the 22d of May, 1915, and the case taken under advisement by the court. On November 9, 1916, the court filed his findings of fact and conclusions of law. It is not necessary to set out in full the findings of the court. We shall only refer to those portions which, in our judgment, are necessary in reaching our conclusions in the premises, as follows:

That on or about December 3, 1910, the defendants needing further capital for the financing of said venture, and the said Elliott desiring to have repaid to him the $5,000 so advanced by him, with interest, said parties entered into a loan contract with said plaintiff, as evidenced by the note and mortgage above mentioned; that as a part of the contract between the plaintiff and the defendants, evidenced by note and mortgage which are exhibits to the petition in plaintiff's action, the defendant Homer Needles proposed to the plaintiff that if he (the plaintiff) would make the defendants a loan of $25,000, the defendants would permit him to reserve out of said loan the sum of $5,400, with which he could purchase the interest of Elliott in said venture; that said proposition was accepted by the plaintiff as a bonus for the making of said loan, and that thereupon the note for $25,000, bearing interest at 10 per cent. from date, and the mortgage securing the payment of the same, were executed; that thereupon the amount of $19,600 was turned over to the defendants, or upon their direction, and that this amount was the only money received by them for the execution and delivery of the $25,000 note; that with the $5,400, reserved by plaintiff out of the total sum loaned, the plaintiff purchased the interest of Elliott in said venture and took from the said Elliott a quitclaim deed executed by Elliott to the plaintiff for all the interest which the said Elliott owned in said land or venture; that the reserving of the $5,400 by said plaintiff out of said note, and which he paid to said Elliott for Elliott's interest, was a bonus to the said plaintiff in addition to the interest at 10 per cent. charged by him. The court further found that said stipulation for 10 per cent. interest on said full sum of $25,000, in view of the fact that the said plaintiff

reserved as a bonus the sum of $5,400 out of said note, made the loan usurious and that the same is usurious; that the agreement so made and said charge for interest at said rate was made by said plaintiff with a full knowledge of the facts that the same constituted a benefit to him as compensation for the use of his money at a greater rate than the rate of interest permitted by law. Wherefore, said usury was by the plaintiff knowingly charged. * * * The court found that the amount of usury charged by the plaintiff for said loans, including the $5,400 reserved out of the original note, together with interest on the note at 10 per cent. per annum, amounted practically to $18,160; that to double this sum as a penalty for usury would amount practically to $36,320, which was far in excess of the amount of money loaned to these defendants. The court found as conclusions of law that both of the notes executed by the defendants were tainted with usury; that when the amount of usury charged and collectible was doubled, it was far in excess of the amount of money advanced by the plaintiff to these defendants; that the defendants should have an excess judgment over against the plaintiff for the excess of usury charged, for the reason that there was not a cross-petition and affirmative relief asked for by defendants; that the plaintiff should take nothing by this action; and that both of the above described mortgages should be canceled and held for naught.

It will be observed that the court found that the payment of the $5,400 for the interest of Elliott, which was assigned to the plaintiff, was received by the plaintiff as a bonus for the use of the money loaned, in addition to the highest rate of interest permissible by the law. A jury being waived, the findings of the court are entitled to the same weight and consideration that would be given to a verdict by the jury, and if there is any evidence, including any reasonable inference tending to support the findings, this court will not reverse for insufficient evidence. The only evidence upon which the claim of usury can be based is that of Homer Needles, in which he says:

"I explained to him (plaintiff) the situation as it stood at the time. We had originally bought the property. Mr. Grubbs, my father and Mr. Elliott, and myself, and that we needed some money to pay off the purchase price, one thing we paid, and that it would soon be due, and put some improvement on the property so it could be sold and to a better advantage, and I stated I would take over the $5,400 and buy the interest of Mr. Elliott, who left the country, and give it to Mr. Foreman as a bonus for making the loan."

If this agreement had been carried out as stated by Mr. Needles, and the interest of Elliott had been secured, or had been transferred to the plaintiff, without regard to the remaining three-fourths, then it might be that the transaction would be usurious; but when the mortgage was executed to secure the payment of the $25,000, the plaintiff's one-fourth was included in the mortgage; in other words, when lots were sold and the interest paid, plaintiff paid one-fourth of the amount. If the entire townsite had been sold and only brought sufficient to pay the amount due plaintiff with the interest thereon, then the plaintiff, would have received only 10 per cent. upon the amount advanced. While Elliott's interest was assigned to him, it was treated as the property of the partnership, or as belonging to the joint venture; and, as we have seen, was included in the mortgage executed to secure the money advanced. Before plaintiff would be entitled to share in any of the profits by reason of his interest in the townsite, it would first be necessary to liquidate this indebtedness, and plaintiff's one-fourth interest would have been used in making the payment of principal and interest. On the other hand, suppose the parties had borrowed from plaintiff the $19,600 at 10 per cent. interest, and this amount repaid by Homer Needles, H. M. Needles, and Grubbs, Elliott's interest not being considered, then the interest would amount to $1,960. As it is, when the interest on the $25,000 was paid, one-fourth being paid by the plaintiff, the other three only paid $1,875, being less than they would have paid had they received $19,600 at 10 per cent, and eliminating the Elliott interest.

As we have said, plaintiff had no beneficial interest in the proceeds of the sale of the lots, except as affected by the mortgage, until after the payment of the amount he had advanced; in fact, there was no method known by which the value of this one-fourth interest could be ascertained, except after the sale of the lots. In 39 Cyc. 959, it is stated:

"Where the lender is to receive something else than money for his loan, as property or services, the value of such profit being necessarily uncertain, the contract is not usurious, even though the probable value is greater than legal interest, unless the consideration so given is so palpably in excess of the certain profit allowed by law as to show a corrupt intent to violate the usury law." Citing Sapp v. Cobb, 60 Ark. 367, 30 S. W. 349; Young v. Miller (Ky.) 7 B. Mon. 540; McGinnis v. Hart, 4 Bibb, 327; Rains v. Kemp, 4 La. 318.

In determining whether or not a contract, lawful upon its face, is usurious, and when two constructions of the transaction are possible, one for and the other against usury, the one against usury will always be adopted. In Deming Inv. Co. v. Grigsby, 65 Oklahoma, 163 Pac. 530, it is said:

"The rule as we understand it to be is laid down in the case of German Savings Bank & Loan Assn. v. Leavens, 89 Wash. 78, 153 Pac. 1092, that: 'In determining whether or not a given contract for the payment of money is usurious, it is clearly the rule that where the contract is susceptible of two constructions, the one lawful and the other unlawful, the former will be adopted. * * * This is on the theory that presumptions of law are in favor of good faith. Men are presumed to intend to keep within the law, and if their contracts can be enforced within the law, the law will presume such was the intent, and so consider it.' "

Further quoting from 39 Cyc. 971:

"But the mere fact that the lender accepts a gift from the borrower, while a suspicious circumstance, will not render the loan usurious, if such gift be really voluntary, and not required by the lender. Nor will a collateral transaction between the borrower and lender, whereby the lender may take profit, render the loan usurious when such transaction was entered into in good faith and without usurious intent. In fact, the general principle governing all the cases is that when the lender has rendered the borrower any bona fide service, or conferred upon him some real benefit, even though it be in connection with the loan, the borrower's promise to compensate the lender for such service or benefit will not, in the absence of usurious intent, render the transaction usurious. And the burden rests upon him setting up usury to show that a commission or other thing of value alleged to have been promised or received, in addition to principal and legal interest, rests upon a usurious consideration. The presumption is that such added benefit rests upon an independent and legal consideration."

The plaintiff did not hold back the $5,400 with which to purchase the interest of Elliott. On the contrary, the check for the full amount was delivered to Mr. Phillips, the attorney selected by all the parties. He received his instructions largely from Homer Needles, and was paid his fees by Homer Needles. The plaintiff had never seen Elliott, did not know him, had no direct dealings with him, and the $25,000 was disbursed as directed by Mr. Needles.

In arriving at the understanding and intention of the parties, we should consider the circumstances surrounding them at the time. Homer Needles, H. M. Needles, and Grubbs found that they were not possessed of sufficient means to make their venture profitable. The mortgage for the balance of the purchase money was falling due. The cry was heard, "Come over into Macedonia and help us." H. M. Needles, the father of Homer Needles, had known the plaintiff for 25 or 30 years. The proof discloses that they were old friends. There is nothing in the evidence indicating that the plaintiff was of a grasping disposition, or that he exacted from the defendants anything more than the legal rate of interest upon the amount borrowed. He was to wait until after enough of the property mortgaged was disposed of to pay the money borrowed before it could be ascertained whether the one-fourth interest secured from Elliott was of any value whatever.

In Cockle v. Flack, 93 U. S. 344, 23 L. Ed. 949, cited by this court in Garland v. Union Trust Co., 49 Okla. 654, 154 Pac. 676, the plaintiffs were engaged in the business of packing pork in Peoria, Ill., and the defendants were commission merchants at Baltimore. They made an agreement in substance that defendants should advance to the plaintiffs as it was needed the sum of $100,000, which they were to invest in the hog product, adding an investment on their own part equal to 20 per cent. of that advanced by the defendants. Defendants were to have interest on their advancements at 10 per cent. per annum. Plaintiffs were to ship the products to defendants for sale and defendants were to have a stipulated commission thereon, but there was a provision that the plaintiffs might sell for themselves without sending to defendants, but if so, the latter were to have their commissions all the same. When the product had all been sold out and an account rendered, a balance was found to be due defendants of $7,054.48, which was mainly, if not wholly, made up of commissions charged on sales not made by defendants and on products which never came to their possession, and they recovered judgment. The recovery was resisted on the sole ground that these commissions were a device to cover usurious interest. The court held that this agreement was not necessarily usurious, and that the profits incidental to handling the products as commission merchants would be sufficient consideration. The court said:

"It is to be considered that defendants were engaged in a business which was legitimate, and in which both custom and sound principle authorized the joint use of their money and their personal service, increased in value by their character for integrity and experience. To both these sources they looked for their profits, and they were necessarily united.

"It was a necessity of their trade, and it was lawful for them, while loaning their money at a specified rate of interest, to stipulate with the parties to whom it was loaned for the incidental advantages of acting as commission merchants for the sale of the property in which the money was to be invested by the borrower. They had the right also to require, as a condition of the loan, that it should be invested in such property as would require their services in selling and handling it. All this is admitted.

"We see no reason why the parties could not go a step further, and stipulate that if for any reason operating in the interest of the borrower he should prefer 'to become his own broker or commission merchant, or to sell at home, he should pay the commission which the other had a right to contract for and receive. Like the port pilot, and other instances, they were ready and willing to perform. They had a place of business, clerks, and their own time and skill ready to devote to the plaintiffs' business. In·that business they had a large pecuniary interest. They had loaned their money without requiring any other security than the obligation of the other party, except that which might arise from the property coming to their hands. To make this property a sufficient security, the contract required of the plaintiffs that they should invest in the same property $20 of their own money to every $80 borrowed of defendants. The relinquishment of this right to control the sale of the property was a good consideration for the commissions which they would have made if they had sold it."

The case of Blackburn v. Hayes, 59 Ark. 366, is similar in principle to Cockle v. Flack, supra, and cites that case. The defendants were commission merchants in the city of New Orleans, and the plaintiffs cotton planters in the state of Arkansas. The defendants advanced to the plaintiffs large sums of money to aid them in raising cotton, which sums plaintiffs agreed to repay with 10 per cent. interest and to ship at least 200 bales of cotton to defendants to be sold by them, or in default thereof to pay $1.25 per bale on such number as they failed to ship, and to secure the performance of the contract, executed a deed of trust on other property. The plaintiffs failed to perform the contract, shipping only 56 of the 200 bales of cotton, and they failed to repay the money advanced to them. In an action to enforce the deed of trust securing the advancements, the defense interposed was usury. It was insisted that the agreement to ship cotton was a device to cover usury, and that the $1.25 was really intended as interest. The chancellor, however, denied this contention and directed the foreclosure of the deed of trust. In its opinion the Supreme Court said:

"The evidence shows that the appellants were cotton planters engaged in making cotton, and that the money advanced to them was loaned for the purpose of aiding them in this business. At the time the contract to ship cotton was entered into, one dollar and twenty-five cents per bale was the commission usually charged and received by commission merchants for selling cotton in the city of New Orleans, where the cotton was to be sold; and Hardie & Co. reasonably expected the cotton to be shipped to them. Under the circumstances, the contract was a valid agreement. It was, in effect, an agreement upon the part of appellants to ship the two hundred bales in consideration of the undertaking of Hardie & Co. to sell the same, and in the sale thereof to use due care and skill, and that Hardie & Co. should be entitled to receive and recover the one dollar and twenty-five cents per bale, in the event appellants should fail to perform their contract, as liquidated damages sustained by them on account of the breach, and not as interest for the loan of the money. Cockle v. Flack, 93 U. S. 344; Norwood v. Faulkner, 22 S. C. 367; Matthews v. Coe, 70 N. Y. 239; Woolsey v. Jones, 84 Ala. 88; Harmon v. Lehman, 5 So. 197; Dozier v. Mitchell, 65 Ala. 511."

As we have seen, the value of the Elliott interest could not be ascertained until after the payment of all expenses incurred in improving, selling, and disposing of the land and the payment of the·$25,000, with interest. We conclude that the transaction between plaintiff and defendants was not usurious on the part of the plaintiff, as the value of the Elliott interest assigned to plaintiff was purely speculative, indefinite, uncertain, and very doubtful. We are therefore of the opinion that the judgment of the trial court should be reversed and remanded for further proceedings not inconsistent with the views herein expressed, and it is so ordered.

OWEN, C. J., and McNEILL, HIGGINS, and BAILEY, JJ., concur.